# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| MAKAL HARRIS | : | No. 18-cr-315-7 |

## MEMORANDUM

PRATTER, J.                                              MAY 3 , 2022

### INTRODUCTION

Trained and experienced police officers often have a good sense of when criminal activity is afoot. Nevertheless, an officer's hunch must rise at least to the level of reasonable suspicion in order to momentarily stop a person.

Makal Harris moves to suppress drugs recovered on his person during a stop and frisk. Because the officer lacked reasonable suspicion to stop him, the Court suppresses the evidentiary use of the drugs found on him. After that stop and frisk, however, the officer correctly assessed that he had probable cause to arrest Mr. Harris. In a search incident to that arrest, the officer found two cell phones. Officers later obtained valid search warrants to search those cell phones and to search Mr. Harris's residence. These later searches were permissible, so the evidence gathered from them is admissible at trial. Thus, the Court grants Mr. Harris's motion in part and denies it in part.

FINDINGS OF FACT

The Court finds the following facts based on the evidence presented at the evidentiary hearing.[1] The Government presented a single witness, Thomas D'Alesio of the Philadelphia Police Department, who recounted the events in question.[2]

On December 11, 2015, Philadelphia Police Officers D'Alesio and Jeffrey Opalski were on patrol in the Overbrook Park neighborhood of Philadelphia in a marked police car. They were assigned to a tactical policing squad known as the "5-Squad" charged with proactive policing of the 19th District. Prior to December 2015, Officer D'Alesio had made approximately 500 drug-related arrests and approximately 100 gun-related arrests in that district. Nonetheless, he described the Overbrook Park neighborhood as a relatively low crime area, explaining that he had only made about 50 drug-related arrests and less than 10 gun-related arrests in that area.

At approximately 7:05 p.m., while driving north on 76th Street on their way to get coffee, the officers passed the rear alley of the 7500 block of Overbrook Avenue. As they passed, they observed two males standing near the rear of 7551 Overbrook Avenue. According to Officer D'Alesio, when the two men noticed the police car driving by, they ducked behind a parked car. This action drew the attention of Officer D'Alesio, who was driving, and Officer Opalski, his partner and passenger. They circled the block and again drove north on 76th Street, this time turning right into the rear alley of the 7500 block of Overbrook Avenue.

As the officers turned down the back alley, the two men were still there, this time standing up, and they did not attempt to duck behind any car. The officers also recognized Mr. Harris as he

---

[1] "On a motion to suppress evidence, the trial judge sits as the finder of fact" and "assess[es] the credibility of witnesses, weigh[]s the evidence, and [draws] any 'inferences, deductions and conclusions'" from the evidence. *United States v. France*, 414 F. Supp. 3d 747, 750 (W.D. Pa. 2019) (quoting *United States v. Harris*, 884 F. Supp. 2d 383, 387 n.2 (W.D. Pa. 2012)).

[2] The Court finds Officer D'Alesio's testimony to be credible. Moreover, the Court commends Officer D'Alesio for resisting any inclination to "oversell" and for his candor, both of which can well serve as a model to others.

2

came out the back door of the residence at 7551 Overbrook Avenue and walked towards the other two men.

Officers D'Alesio and Opalski knew Mr. Harris because of their prior familiarity with him. Mr. Harris had been convicted in 2007 for robbery, aggravated assault, and firearm violations. In 2014, Officer D'Alesio and Officer Opalski stopped a vehicle that Mr. Harris was in. Officer D'Alesio discovered a drug compartment in the vehicle, and after obtaining a search warrant for the vehicle, discovered heroin in the compartment. Mr. Harris was acquitted of that charge. And in March 2015, a person arrested near the 7500 block of Overbrook Avenue had told police that Mr. Harris had been packing and distributing drugs and storing firearms at his residence. This informant identified Mr. Harris by both his photo and his nickname "Stu." The Attorney General's office later corroborated that Mr. Harris lived at this address, and said that dealers were driving to Washington, D.C. a few times a month to bring back drugs. Based on this information, the officers added the 7500 Overbrook area to their patrols.

As the police car came down the alley towards him, Mr. Harris stopped, put his hands in the front pocket of his hoodie sweatshirt, and began to back up towards his residence. Officer D'Alesio later said that when he *stopped* Mr. Harris, he was about five feet outside his back door. At the same moment, Officer D'Alesio got out of the police car and ordered Mr. Harris to stop and put his hands up. Based on his training and experience, Officer D'Alesio knew that people often put their hands into their pocket in order to hold a gun when they see the police. Upon the police directive, Mr. Harris took his hands out of his pocket and put them up in the air. Officer D'Alesio then noticed a bulge in the pocket of Mr. Harris's sweatshirt. Believing the bulge to be a gun, Officer D'Alesio conducted a pat down frisk of Mr. Harris. Upon touching the bulge through Mr. Harris's sweatshirt, Officer D'Alesio sensed immediately, based on his training and experience,

that the bulge was a "rack" of heroin.[3] Officer D'Alesio then placed Mr. Harris under arrest and more fully searched him incident to that arrest, recovering $878 and two iPhones.

The officers "cleared" the residence at 7551 Overbrook to ensure there were no other people inside. They then secured the residence while waiting for a search warrant. The warrant issued around 1:00 a.m. on December 12, Gov. Ex. 7, and police executed the warrant about five minutes later. Inside, police recovered packaging material consistent with narcotics trafficking and a glass jar containing Lidocaine, which is commonly used to "cut" heroin before distribution.

Less than a week later, a Philadelphia police officer operating as part of a Drug Enforcement Administration (DEA) task force obtained search warrants for the two iPhones taken in the search of Mr. Harris. Gov. Exs. 8 & 9. An analyst attempted to extract data from the cell phones the following day but was unsuccessful because the DEA did not yet have the software to break the passwords protecting the phones. Five years later, however, the DEA used upgraded software to extract the content of the cell phones.

A grand jury returned an indictment against Mr. Harris for possession with intent to distribute a substance containing heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

Mr. Harris moves to suppress all of the evidence recovered as part of this incident. The Government opposes this motion. The Court held a hearing on the motion and received supplemental briefing from the parties, leaving the matter ripe for the Court's resolution.

---

[3] At the suppression hearing, Officer D'Alesio explained that a "rack" of heroin consists of 10 "bundles" of heroin. He further explained that a "bundle" contains 14 individual packets of heroin. Thus, a "rack" contains 140 individual packets of heroin.

DISCUSSION

Mr. Harris contends that Officer D'Alesio's initial stop of him was unconstitutional under the Fourth Amendment to the United States Constitution because Officer D'Alesio lacked reasonable suspicion to stop him. As a result, Mr. Harris argues the evidence discovered during the frisk of his person and the subsequent search of his house and cell phones is "fruit of the poisonous tree" that must be excluded. The Government counters that Officer D'Alesio *did* have reasonable suspicion for the initial stop. Even if he did not, the Government argues, all the evidence discovered subsequent to that initial stop and frisk is still admissible under the good faith exception to the exclusionary rule.

In general, "the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (internal citation omitted). The Government must prove that the search or seizure was reasonable by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

A motion to suppress involves a sequential analysis of events. Thus, the Court first analyzes the initial stop and frisk of Mr. Harris before addressing his arrest, search incident to arrest, and subsequent searches of Mr. Harris' cell phones and residence based on search warrants. The Court finds that the initial stop and frisk of Mr. Harris was unconstitutional and thus suppresses the evidence discovered as part of that immediate stop and frisk but does not suppress the evidence subsequently discovered.

I.    **The Initial *Terry* Stop of Mr. Harris Was Not Based on Reasonable Suspicion and the Drugs Seized During the Subsequent Frisk Must Be Suppressed**

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend IV. As a general rule, a police officer must obtain a warrant supported by probable cause for a search or seizure to be reasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967); *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006). That general rule, however, is subject to numerous exceptions. As relevant here, an officer may conduct a brief investigatory stop (a seizure[4]) of an individual without arresting that person and even without probable cause so long as the officer, in light of his experience, has reasonable, articulable suspicion that "that criminal activity may be afoot." *Terry*, 392 U.S. at 30; *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Such a stop is now known colloquially as a "*Terry* stop."

In order to engage in a *Terry* stop, an officer must have "reasonable suspicion" of criminal activity. *Wardlow*, 528 U.S. at 123 (internal quotation marks omitted). Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Id.* In fact, "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *United States v. Ubiles,* 224 F.3d 213, 217 (3d Cir. 2000). And reasonable suspicion does not require "'rul[ing] out the possibility of innocent conduct.'" *United States v. Henley*, 941 F.3d 646, 653 (3d Cir. 2019) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). The officer's suspicion "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Still, an officer must

_____

[4] A "*Terry* stop" constitutes a seizure under the Fourth Amendment. *See United States v. Lowe*, 791 F.3d 424, 429 (3d Cir. 2015). In certain cases, there may be a dispute as to precise moment when a person is "seized." *See e.g.*, *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021); *California v. Hodari D*, 499 U.S. 621, 626 (1991). Here, the parties do not dispute that Mr. Harris was seized at the moment Officer D'Alesio ordered him to stop and raise his hands and Mr. Harris complied. Doc. No. 680, at 2 n.1.

have more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry*, 392 U.S. at 27.

A court reviewing an officer's determination "must look at the 'totality of the circumstances' of each case" to determine whether the officer had reasonable suspicion. *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). Moreover, courts "give considerable deference to police officers' determinations of reasonable suspicion." *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (internal quotation marks omitted).

Here, the facts established at the suppression hearing lead to the conclusion that Officer D'Alesio did not have reasonable suspicion at the moment he stopped Mr. Harris. At the threshold, Officer D'Alesio clarified that this area of Overbrook Park is *not* a high crime area. This is important because the Supreme Court has clarified that a person's presence in a high crime area in tandem with some other factor, such as flight from police, may give rise to reasonable suspicion. *Wardlow*, 528 U.S. at 124. That is not present in this case. Quite the contrary, actually. Moreover, critical for purposes of this motion, Officer D'Alesio confirmed that he did not see any bulge in Mr. Harris's sweatshirt pocket until *after* he had already seized Mr. Harris by ordering him to stop and put his hands up. Thus, at the moment of the *Terry* stop, Officer D'Alesio's suspicion was based on (1) Mr. Harris's movement exiting his back door towards the two other males, (2) Mr. Harris's subsequent movement backing towards his residence upon seeing the officers, (3) Mr. Harris's one-time placement of his hands in the pocket of his sweatshirt, (4) Officer D'Alesio's preexisting knowledge of Mr. Harris's alleged drug activity from the informant, and (5) Officer D'Alesio's preexisting knowledge of Mr. Harris's prior convictions. But none of these factors, either individually or in tandem, justified Officer D'Alesio's stop.

*First*, Mr. Harris's movement towards the two other males did not create reasonable suspicion. At the time Officer D'Alesio stopped Mr. Harris, he had only walked about five feet out of his back door. Even if Officer D'Alesio had reasonable suspicion to stop the two other men because they had ducked behind a car earlier, that would not have given him reasonable suspicion to stop or search Mr. Harris because "'mere propinquity to others independently suspected of criminal activity does not, without more'" give rise to reasonable suspicion. *United States v. Navedo*, 694 F.3d 463, 469 (3d Cir. 2012) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Had Mr. Harris engaged with these men in any sort of way that confirmed the officers' suspicion of drug activity, that, combined with the two men's suspicious behavior, may have given rise to reasonable suspicion. But that is not what happened here. Thus, this adds nothing to Officer D'Alesio's reasonable suspicion of Mr. Harris.

*Second*, Mr. Harris's few steps backwards towards his residence did not provide a factual basis for reasonable suspicion. First, unprovoked flight, standing alone, is not sufficient for reasonable suspicion. *Navedo*, 694 at 474. Plus, Mr. Harris's movement did not constitute flight because "a few startled steps back in the face of onrushing, armed police officers is entirely consistent with a surprised reaction and even acquiescence." *United States v. Lowe*, 791 F.3d 424, 434 (3d Cir. 2015); *see also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area. . . ."). Thus, this fact also adds nothing to Officer D'Alesio's reasonable suspicion.

*Third*, Mr. Harris's placement of his hands in the pocket of his sweatshirt also did not give rise to reasonable suspicion. As Officer D'Alesio testified, these events happened on a cold December night after the sun had gone down. Thus, while Officer D'Alesio's training and

8

experience suggested Mr. Harris might have been reaching for a gun, logically he might also have been trying to keep his hands warm. Officer D'Alesio confirmed that could have been true. Mr. Harris made no other physical or limited hand gestures that would suggest he had a gun in the pocket, such as repeatedly putting his hands in his pockets after being asked not to. *Cf. United States v. Hill*, 811 F. App'x 761, 762–63 (3d Cir. 2020). Thus, again, this fact adds nothing to Officer D'Alesio's possible reasonable suspicion.

**Fourth**, Officer D'Alesio's knowledge of Mr. Harris's prior convictions alone also did not give rise to reasonable suspicion. To be sure, a person's prior convictions can be a valid factor for an officer to consider in establishing reasonable suspicion. *United States v. Green*, 897 F.3d 173, 187 (3d Cir. 2018); *United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir. 2009). But without some additional credible evidence connecting those prior convictions to the activity giving rise to the officer's hunch, it is not a valid basis for reasonable suspicion. *Mathurin*, 561 F.3d at 177. Otherwise, a person who has been convicted, sentenced, and released would, for the rest of his or her life, have diminished Fourth Amendment protections relative to other members of society. Of course, the Constitution would not countenance such diminished rights, just as it does not tolerate diminished constitutional protections for people simply because they happen to live in an area of increased criminal activity. *Wardlow*, 528 U.S. at 124.

Here, Officer D'Alesio knew that Mr. Harris had been previously convicted of drug trafficking. He certainly could have considered this when assessing Mr. Harris's activity that evening. But at the moment of the stop, Mr. Harris's actions were not connected to anything involving drugs or drug trafficking. Instead, Mr. Harris had come out of the back door of his residence, potentially to speak to the two men outside, or potentially to go for a walk, get a cup of coffee, or simply get a breath of fresh air. And, even if he was going to speak to these two other

men, an individual with prior drug convictions is not suspicious merely because he has a conversation with another person. Officer D'Alesio did not wait to investigate and corroborate whether Mr. Harris's prior history of drug trafficking was connected to his actions that night. Thus, this fact also adds nothing to Officer D'Alesio's reasonable suspicion at the moment of the stop.

*Fifth*, Officer D'Alesio's knowledge based on the information provided from the informant also did not give rise to reasonable suspicion. In assessing tips for purposes of establishing reasonable suspicion, courts analyze an informant's "veracity, reliability, and basis of knowledge" *Alabama v. White*, 496 U.S. 325, 328 (1990) (internal quotation marks omitted). Courts consider the following:

- Whether the information was "relayed from the informant to the officer in a face-to-face interaction such that the officer 'had an opportunity to appraise the witness's credibility through observation.' " *Brown*, 448 F.3d at 249 (quoting *United States v. Nelson*, 284 F.3d 472, 480 (3d Cir. 2002)).

- Whether the person providing that information can be "held responsible if [his] allegations turn out to be fabricated." *Id.* (quoting *Valentine*, 232 F.3d at 354).

- Whether the content of the tip is such that it is information detailing "a pattern of criminal activity known to the police, but not to the general public" and "the tip could not have been generated by the general public, nor based solely on observation." *Id.* (quoting *Nelson*, 284 F.3d at 482, 484).

- Whether the person providing the tip has *recent* first-hand knowledge of the criminal activity. *Id.* at 249–50.

- Whether the tip accurately predicts what will follow such that the police can "test the informant's knowledge or credibility." *Id.* at 250 (quoting *Florida v. J.L.*, 529 U.S. 266, 271 (2000)).

Here, most of the factors count in favor of the information from the informant being reliable. The informant provided the information directly to Officer D'Alesio. Conceivably, the informant, who had been arrested, could be held responsible if it was not true. The information was not known to the general public, nor could it be known by observation alone. And the informant had apparently bought the drugs for which he was arrested directly from Mr. Harris.

There is, however, a large meaningful gap between the information provided by the informant and the basis for Officer D'Alesio's stop. At the moment of his investigatory stop, Officer D'Alesio had only witnessed Mr. Harris walking out the back door of the 7551 Overbrook residence towards two men, nothing more. Mr. Harris's actions alone did not corroborate any of the details that the informant provided. The informant had stated that Mr. Harris was dealing drugs out of the 7551 Overbrook Avenue, which included repackaging and distributing those drugs. Officer D'Alesio observed nothing that would suggest such drug activity. The informant also stated that Mr. Harris kept firearms inside his 7551 Overbrook residence. Officer D'Alesio saw no firearms, or anything resembling them prior to the stop. Finally, the informant stated that Mr. Harris was involved with the transfer of drugs between Washington D.C. and Philadelphia, taking three vehicles to D.C. approximately once a month, one of which had a compartment to store drugs. Officer D'Alesio saw nothing to do with the alleged motor pool either.

There is also a large time gap. Officer D'Alesio happened upon Mr. Harris by serendipitous accident during a coffee run *nine months* after this informant provided all of this information. While "age alone. . . does not determine staleness" of information in seeking a search warrant,

11

*United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993), in cases involving investigatory stops based on reasonable suspicion from a tip, the stop generally takes place almost *immediately* after the tip. *See, e.g., Lowe*, 791 F.3d at 428 (officers responded to area of alleged crime immediately after receiving information through anonymous tip and almost immediately initiated *Terry* stop upon reaching area); *United States v. Robertson*, 305 F.3d 164, 166 (3d Cir. 2002) (police initiated *Terry* stop of robbery suspects aboard SEPTA bus based on tip two to three minutes prior); *Valentine*, 232 F.3d at 353–54 (police initiated *Terry* stop of man suspected to have a gun immediately after tip). Here, in contrast, the informant tipped off the officers in March 2015, but officers did not seek a search warrant at that time nor, apparently, did they begin any investigation of Mr. Harris other than adding in regular drives through the area.[5] Thus, this prior information is, at best, a *de minimis* addition to Officer D'Alesio's reasonable suspicion.

In sum, at the moment he initiated the *Terry* stop, the Court concludes that Officer D'Alesio lacked the requisite reasonable suspicion. His suspicion of the two other men did not implicate Mr. Harris. Mr. Harris's few steps backwards towards his own residence did not constitute flight. And Officer D'Alesio's knowledge of Mr. Harris's prior criminal convictions via his own experience was not corroborated by Mr. Harris's actions at that moment of the stop. Thus, the only potential basis for Officer D'Alesio's suspicion was his generalized, possibly stale, knowledge based on the information from the informant alone and not in tandem with any other factor. That is not sufficient.

---

[5] The fact that no officer sought a search warrant based on the information provided by the informant further highlights the problem with relying on that information nine months later to establish reasonable suspicion. Had the officers devoted time to corroborating some of the information from the informant, there is good reason to think they could have obtained a search warrant for Mr. Harris's residence. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983). Plus it took the officers only a matter of hours to obtain the search warrant on the night of Mr. Harris's arrest.

To be sure, Officer D'Alesio's hunch about Mr. Harris ended up being correct. And had Officer D'Alesio and Officer Opalski surveilled the scene rather than immediately stopping Mr. Harris, there is good reason to think that they would have later had reasonable suspicion to stop and frisk Mr. Harris. But a Court's role is not to develop a counterfactual hypothesis to justify an officer's actions *ex post*. Based on the facts in front of the Court, Officer D'Alesio did not have reasonable suspicion to stop Mr. Harris at the moment of the stop. Thus, the Court finds that the initial stop of Mr. Harris was unconstitutional in violation of the Fourth Amendment.

In order to frisk a person, an officer must have reasonable suspicion that the person is "armed and presently dangerous." *Terry*, 392 U.S. at 30. Here, the Court does not need to separately analyze the constitutionality of the frisk or Officer D'Alesio's discovery of the drugs as part of that frisk.[6] Because the initial stop was unconstitutional, Officer D'Alesio frisked Mr. Harris concurrently, and there were no intervening event between Officer D'Alesio initiating the stop and conducting the frisk, the drugs seized during the frisk must be suppressed as "fruit of the poisonous tree."[7] *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *United States v. Williams*, 400 F. Supp. 2d 673, 681 (D. Del. 2005).

---

[6] The parties do not contest the constitutionality of Officer D'Alesio's discovery of drugs on Mr. Harris as part of this *Terry* frisk. Officer D'Alesio testified that, during his frisk of Mr. D'Alesio's sweatshirt, he knew immediately, based on his training and experience, that the object was a "rack" of heroin, meaning he had probable cause to believe the item was contraband. The Court credits Officer D'Alesio's testimony on this point. Mr. Harris does not contest this fact. Thus, the Court finds that Officer D'Alesio's recovery of the drugs in Mr. Harris's pocket was constitutional under the "plain feel" doctrine. *Minnesota v. Dickerson*, 508 U.S. 366, 374–76 (1993); *accord United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007).

[7] The Government has not argued that the fruits of this *Terry* stop and frisk should be admissible despite any Fourth Amendment violation either because the exclusionary rule should not be applied in this case or because Officer D'Alesio's *Terry* stop and frisk fall within the good faith exception to the exclusionary rule. Instead, the Government has argued only that the good faith exception should apply to the subsequent search of Mr. Harris's cell phones and residence pursuant to warrants supported with probable cause. Doc. No. 651, at 10; Doc. No. 680, at 4–5. As such, the Government waived this argument, and the Court expresses no opinion on the drugs' admissibility under this theory. *See United States v. Dupree*, 617 F.3d 724, 733 (3d Cir. 2010).

II.    **The Fruits of the Subsequent Arrest, Search Incident to Arrest, and Searches of Mr. Harris's Cellphones and Residence Are Not Suppressed Under the Exclusionary Rule**

Because Officer D'Alesio only gained probable cause for the arrest as a result of the evidence uncovered during the unconstitutional *Terry* stop and frisk, the question at this stage is whether Officer D'Alesio's arrest of Mr. Harris, subsequent search incident to that arrest and seizure of the money and cell phones discovered, and subsequent search of Mr. Harris's cell phones and residence based on search warrants must also be suppressed as "fruit of the poisonous tree."

Although a violation of an individual's Fourth Amendment rights can justify exclusion of evidence obtained as a result of that violation, "[w]hether to suppress evidence under the exclusionary rule is a separate question." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014). There is "no constitutional right to have the evidentiary fruits of an illegal search or seizure suppressed at trial." *Id.* (citing *Davis v. United States*, 564 U.S. 229, 236 (2011)). Application of the exclusionary rule requires a balancing between, on the one hand, the "deterrent value" of exclusion to law enforcement officers (*i.e.*, compelling respect for the Fourth Amendment) and, on the other hand, the social costs of excluding "reliable, trustworthy evidence" of guilt and "setting a criminal loose in the community." *Katzin*, 769 F.3d at 171 (quoting *Davis*, 564 U.S. at 237).

The good faith exception to the exclusionary rule "was developed to effectuate this balance." *Id.* "Where the particular facts of a case indicate that law enforcement officers 'act[ed] with an objectively reasonable good-faith belief that their conduct was lawful, or when their conduct involved only simple, isolated negligence,' there is no illicit conduct to deter." *Id.* (quoting *Davis*, 564 U.S. at 238). In other words, "exclusion is appropriate only where law enforcement conduct is both 'sufficiently deliberate' that deterrence is effective and 'sufficiently culpable' that deterrence outweighs the costs of suppression." *Id.* (quoting *Herring v. United States*, 555 U.S.

14

135, 144 (2009)). Thus, a court determining whether the good faith exception applies must determine "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Id.* (quoting *Herring*, 555 U.S. at 145).

Under the good faith exception, the arrest of Mr. Harris and search incident to that arrest are not subject to the exclusionary rule. An officer may constitutionally arrest (seize) a person without a warrant, so long as that arrest is supported by probable cause. *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *United States v. Watson*, 423 U.S. 411, 423–24 (1976). Upon discovery of the "rack" of heroin in Mr. Harris's sweatshirt, Officer D'Alesio rightly believed that he had probable cause. Thus, once he had the drugs, Officer D'Alesio had an objectively reasonable, good-faith belief that his arrest of Mr. Harris was constitutional. *Beck v. Ohio*, 379 U.S. 89, 91 (1964) ("Whether [an] arrest was constitutionally valid depends. . . upon whether, at the moment the arrest was made, the officers had probable cause to make it."); *United States v. Laville*, 480 F.3d 187, 194 (3d Cir. 2007). The search of Mr. Harris incident to that arrest is not subject to the exclusionary rule for the same reason. Once Officer D'Alesio had arrested Mr. Harris, he could constitutionally search him incident to that arrest. *Maryland v. King*, 569 U.S. 435, 449 (2013).

Because Officer D'Alesio's conduct after the *Terry* stop and frisk was constitutional, there would be no deterrent value to excluding the fruits of the arrest and search incident to that arrest. On the facts presented, there is no reason to think that Officer D'Alesio deliberately violated Mr. Harris's constitutional rights and nothing to suggest Officer D'Alesio's conduct was culpable. Thus, the suppression of the cash and cell phones would have no deterrent effect because suppression of the money and cell phones here would only be in reaction to a constitutional arrest and constitutional search incident to that arrest, *not* the unconstitutional *Terry* stop. In other words, there is no need to deter purely constitutional conduct. Therefore, the Court denies Mr. Harris's

motion to suppress insofar as it seeks to suppress the money and cell phones seized during Officer D'Alesio's search of Mr. Harris incident to Mr. Harris's arrest.

Similarly, application of the good faith exception to the subsequent search of Mr. Harris's cell phones and residence is uncomplicated. Officer D'Alesio correctly believed that he could seize and retain Mr. Harris's cell phones after recovering them incident to Mr. Harris's arrest. *See Riley v. California*, 573 U.S. 373, 386, 388 (2014). The police, operating on the DEA task force, later obtained search warrants based on probable cause for those phones before searching them. Gov. Exs. 8 & 9. The police also correctly adjudged this to be constitutional. *Riley*, 573 U.S. at 401. Likewise, the Philadelphia police officers' search of Mr. Harris's residence and seizure of certain items within based on a search warrant supported by probable cause was constitutional. *United States v. Leon*, 468 U.S. 897, 926 (1984). Mr. Harris has not argued that the officers were "dishonest or reckless" in preparing their probable cause affidavits, *id.*, nor has he argued that the warrant itself was so lacking in particularity that the officers should have declined to execute the warrant, *Groh v. Ramirez*, 540 U.S. 551, 563 (2004). Hence, once again, there is no unconstitutional conduct to deter and, therefore, the Court denies Mr. Harris's motion to suppress insofar as it seeks to suppress the fruits of the searches of his cell phones and his residence.

### CONCLUSION

For the foregoing reasons, the Court grants Mr. Harris's motion to suppress in part and denies it in part. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

16